RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0303p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ADAM GERICS,

     *Plaintiff-Appellant*,

 *v.*

ALEX TREVINO, also known as Felix Trevino; JOSEPH
HALL; CITY OF FLINT, MICHIGAN; BOBBY FOWLKES,

     *Defendants-Appellees*.

No. 19-1955

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-12922—Gershwin A. Drain, District Judge.

Decided and Filed: September 11, 2020

Before: DONALD, THAPAR, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Solomon M. Radner, EXCOLO LAW, PLLC, Southfield, Michigan, for Appellant.
William Y. Kim, Kelly J. Thompson, CITY OF FLINT DEPARTMENT OF LAW, Flint,
Michigan, for Appellee Joseph Hall.

 NALBANDIAN, J., delivered the opinion of the court in which DONALD and
THAPAR, JJ., joined. THAPAR, J. (pp. 14–16), delivered a separate concurring opinion.

───────────────

## OPINION

───────────────

 NALBANDIAN, Circuit Judge. Robert Frost once wrote, with a great deal of irony, that
good fences make good neighbors. His point being that fences often create, and do not mend,

divisions.  But he likely didn't have neighbors like Adam Gerics in mind.  That Gerics did not get along with his neighbor Timothy Monahan is an understatement.  But Gerics took those poor neighborly relations to another level by continuously and publicly shouting expletives and insults at Monahan over the course of three to five months before getting arrested for doing so.  After the state court quashed the criminal charges against him, Gerics sued the arresting officer and others for damages in federal court.  Gerics and Defendants cross-moved for summary judgment—arguing, as relevant here, about whether there was probable cause for Gerics's arrest. The trial court denied both motions and set the case for trial.  The jury eventually found in Defendants' favor.  Gerics now appeals the district court's denial of summary judgment. Although we think that the probable-cause issue was not one for the jury, we DISMISS the appeal for lack of jurisdiction.

## I.

Adam Gerics and Timothy Monahan were neighbors in Flint, Michigan.  Gerics had a general reputation in the neighborhood as "an unstable individual[.]"  (R. 78-6, Monahan Dep., PageID 847.)  He "was [also] notorious" for occupying others' property and "attach[ing] liens to [that] property and t[ying] them up[.]"  (*Id.* at 846.)  The mayor even expressed problems with Gerics's conduct "squatting on a whole bunch of city and [other] property" as well as "digging [a] . . . huge hole in the middle of" that property to create "a lake or something like that[.]"  (*Id.* at 821–23.)

Monahan, on the other hand, lived in the neighborhood with his partner Bill Griffin.  At one point, Monahan served as the president of the neighborhood association, an organization of which Gerics was once an officer.  In fact, Monahan participated in a wide array of neighborhood organizations.  For a time in the mid-1990s, Monahan served as the president of the Michigan "PWA" (Persons With AIDS) Task Force.  (*Id.* at 795.)

For whatever reason, Gerics seemed to hate Monahan.  Gerics felt so strongly that, over a span of three to five months, he took it upon himself to publicly announce his personal displeasure with Monahan.  In fact, Gerics would stand on the corner while Monahan cut grass for the neighborhood association and through a megaphone allege that Monahan, among other

things, "[i]s an HIV positive mother fucking pedophile" and that Monahan "was infecting boys in the Philippi[]nes[.]" (*Id.* at 785–86, 805.) Gerics filed multiple lawsuits against Monahan, all of which Gerics lost. And Gerics put up signs on and near his property alleging, among other things, that Monahan had stolen from Gerics's family, that Monahan ruined Gerics's family, and that Gerics "would kill [Monahan and his partner] if [they] entered [or] . . . came near [Gerics's] house." (*Id.* at 803.)

After some time, Monahan had enough. He spoke to the officer manning the police department's front desk about Gerics publicly disclosing Monahan's HIV status and reported Gerics's other behavior. But the officer advised that the disclosure of Monahan's HIV status sounded more like a civil rather than criminal matter. The officer, however, advised Monahan that if Monahan "could prove that [Gerics] was verbally threatening [Monahan]," then the officer could "do something." (*Id.* at 820.) Monahan had also spoken to the mayor several times about his problems with Gerics's conduct. And he had complained to the chief of police about Gerics's behavior over a span of "a couple months." (*Id.* at 834.)

Then came Monahan's meetings with city officials. Through these meetings, Monahan informed the mayor, chief of police, and building department about the harassment he endured from Gerics. (*Id.* at 788–91 (testifying that Monahan let the chief of police know that he "couldn't even walk down to the [local cafe] [] without being harassed by [] Gerics" and that the harassment happened "all the time").) So the chief of police and the mayor arranged for Sergeant Joseph Hall to go by Monahan's house a couple of days later to investigate Monahan's complaint.

When Hall showed up near Monahan's house, Monahan spoke to him about his problem and described the background of the two neighbors' contentious relationship, including the signs Gerics had placed on his own lawn. Monahan let Hall know that he "was unable to walk up the street without being harassed" and that "no matter what happened[,]" if Monahan was walking around, Gerics "would come out and harass" Monahan. (*Id.* at 793-94.) He also predicted that Gerics would come out and harass Monahan that morning while the two walked down the street together. True to form, Gerics came out and, though he didn't yell, started "loud[ly]" and

"aggressive[ly]" accusing Monahan of being "a thief" among other allegations and "said the F word twice[.]" (*Id.* at 794; R. 78-1, Hall Dep., PageID 645, 674, 794.)

Given Hall's prior knowledge of Monahan's allegations and his observation that morning, Hall arrested Gerics. Another officer then booked Gerics at the Genesee County Sheriff's Department. As part of the booking process and after warning Gerics on the consequences of bringing contraband into the jail, an officer searched Gerics's clothing and found a bag with what the officer suspected was and what later tested positive as marijuana. The Genesee County Prosecutor's Office then brought criminal charges against Gerics for: (1) furnishing contraband to prisoners; (2) assaulting, resisting, or obstructing a police officer (based on events during the arrest); and (3) possession of marijuana. The state court ultimately found Hall had no probable cause to arrest Gerics and excluded any evidence found as a result of that arrest. So it granted Gerics's motion to quash the criminal proceedings against him.

Gerics sued. He named as Defendants the County of Genesee, City of Flint, and individuals, including Sergeant Hall. He sought damages under 42 U.S.C. § 1983 because he alleged, among other claims,[1] that Hall violated his Fourth Amendment rights by unlawfully arresting him and by unreasonably seizing his cell phone during the arrest.

After discovery, Gerics and Defendants cross moved for summary judgment on Gerics's false arrest claim.[2] Defendants argued that claim failed because Hall had probable cause to arrest Gerics for breaching the peace and harassment in violation of Flint City Ordinances § 31-12(a)(5) and § 31-12(a)(8), respectively, as well as for criminal stalking under Michigan Compiled Laws § 750.411h(2)(a). Defendants also urged the district court to grant them summary judgment on Gerics's seizure claim for two reasons. First, they argued that both

---

[1]Gerics's brought nine claims altogether: (1) retaliatory arrest, (2) false arrest, (3) excessive force, (4) unlawful seizure (of his cell phone), (5) failure to intervene, (6) malicious prosecution, (7) retaliatory prosecution, (8) abuse of process, and (9) municipal liability under *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S 658 (1978). Defendants moved the district court to dismiss the last four of those claims. The court granted that motion in part and denied it in part: It dismissed the last two claims but allowed claims six and seven to proceed. So after the motion-to-dismiss stage, the first seven of Gerics's claims remained.

[2]Both Defendants and Gerics also sought summary judgment on various claims other than Gerics's false arrest claim. The court granted Defendants' motion in part and denied it in part. And it denied Gerics's motion. After the summary judgment proceedings, Gerics's false arrest, unlawful seizure, and retaliatory arrest claims against Hall as well as the excessive force claim against Hall and another officer went to the jury.

parties testified that Hall seized a *camera* and not a cell phone during the arrest. Second, the seizure was not the type of seizure contemplated by the Fourth Amendment because Hall only temporarily seized the item (cell phone or not) in the course of making an arrest and thereafter threw it back on Gerics's property where Gerics later recovered it undamaged.

Gerics argued the exact opposite. He sought summary judgment on his false arrest claim because he argued Hall did not have probable cause to arrest him. Given the illegal arrest, Gerics argued for summary judgment on his unlawful seizure claim as well.

The judge denied the motions for both claims. He first explained that Gerics must prove the arresting officer lacked probable cause to arrest Gerics to make out a successful false arrest claim. Gerics had contended that no reasonable juror could find Hall had probable cause "because [Hall] did not witness any of the acts Monahan accused Plaintiff of committing." (R. 98, Op. & Order, PageID 1470.) Defendants on the other hand alleged Hall had probable cause for the arrest given Monahan's allegations of Gerics's past conduct and the events on the morning of the arrest. (*Id.* at 1469 (explaining that "Hall observed [Gerics] criticize Monahan" and "ask[] him why he was standing in front of [Gerics]'s 'fucking' home").) So the court found there remained a material question—"whether it was reasonable for [] Hall to rely on Monahan's representations, without much more" to form probable cause for the arrest—which the judge found was a "question of fact properly left to the jury." (*Id.* at 1470 ("[W]hether Monahan's statements, coupled with [] Hall's personal observations, created enough probable cause to arrest Plaintiff, is a question best left for the trier of fact.").)

The judge also found that "a material question of fact remains surrounding whether [Hall's] conduct was reasonable when he grabbed and threw [Gerics]'s cellphone during the arrest." (*Id.* at 1477.) And he agreed that if Hall seized and threw Gerics's cell phone as part of the arrest, that "seizure would likely be reasonable[.]" (*Id.*) But the judge acknowledged he could not grant summary judgment on that claim for either party on those grounds given the "open question [at that time] as to whether [Gerics]'s arrest was in fact supported by probable cause." (*Id.* at 1477–78.)

The case proceeded to trial during which the judge instructed the jury that it must find whether Hall had probable cause to arrest Gerics and, based on that finding, return a verdict on the false arrest claim for either Hall or Gerics. The jury then found in Hall's favor on Gerics's false arrest and unlawful seizure claims.[3] Gerics now appeals, not to question the jury verdict but the denial of his summary judgment motion.

## II.

Gerics alleges the district court, at summary judgment, erroneously found a material question of fact on whether Hall had probable cause to arrest Gerics. The court, in his view, should have resolved the probable-cause question at summary judgment. And on the undisputed facts, he argues that the court should have granted him summary judgment because Hall did not have probable cause to arrest him. And given the lack of probable cause to arrest him, Gerics claims Hall unlawfully seized his cell phone during the warrantless arrest.

The problem is that usually we cannot review a denial of summary judgment post-trial: "a party may not 'appeal an order denying summary judgment after a full trial on the merits.'" *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)); *Kennedy v. City of Cincinnati*, 483 F. App'x 110, 112 (6th Cir. 2012) (dismissing for lack of jurisdiction the plaintiff's appeal of the district court's denial of his summary judgment motion after a full merits trial that ended with the plaintiff's loss). If a case involves disputed material facts, the jury or judge properly resolves those questions on the evidence received at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). So it makes sense that we could not after the trial review a summary judgment appeal—one "based on the evidence presented prior to trial, not the evidence received at trial[.]" *Nolfi*, 675 F.3d at 545 ("Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion." (quoting *Ortiz*, 562 U.S. at 184)). But that rule doesn't always apply. We can review summary judgment denials that raise only "'purely legal' issues"—those that "typically involve contests not about what occurred, or why

---

[3]The jury also found for Defendants on the retaliatory arrest and excessive force claims remaining after summary judgment.

an action was taken or omitted, but disputes about the substance and clarity of pre-existing law." *Ortiz*, 562 U.S. at 190; *see also In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012).

Because the historical facts are undisputed, Gerics urges us to find that the probable cause question in his civil suit falls within this exception to our usual rule. Defendants contend otherwise. Both parties find support in our caselaw. This court has inconsistently treated the ultimate question of probable cause in civil cases as both a question of fact for the jury *and* as a question of law for the judge. *See Jones v. Clark County*, 959 F.3d 748, 776 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part) (recognizing that "[o]ur § 1983 cases have not spoken with one voice on" whether "a jury should decide the ultimate question [of] probable cause" before explaining that he "tend[s] to think [of] it [a]s a legal question"); *Harmon v. Hamilton County*, 675 F. App'x 532, 543, 543 n.7 (6th Cir. 2017) (recognizing our inconsistent treatment); *Romo v. Largen*, 723 F.3d 670, 684 (6th Cir. 2013) (Sutton, J., concurring in part and in the judgment) (same); *McKenna v. Edgell*, 617 F.3d 432, 441–42 (6th Cir. 2010) (same).

And in fact, other courts of appeals have not spoken with one voice on this question. *See Donahue v. Wilhongi*, 948 F.3d 1177, 1187 (10th Cir. 2020) ("'[W]here there are no disputed questions of historical fact such as on summary judgment,' the court 'makes the determination of . . . probable cause . . . on its own' as a question of law." (alterations omitted) (quoting *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1253 (10th Cir. 2013))); *Dufort v. City of New York*, 874 F.3d 338, 347–48 (2d Cir. 2017) ("Probable cause is a mixed question of law and fact. Questions of historical fact . . . are to be resolved by the jury. However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.'" (citations omitted) (quoting *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007))); *Bell v. Irwin*, 321 F.3d 637, 640–41 (7th Cir. 2003); *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467–48 (3d Cir. 2016) (explaining that the existence of probable cause "is necessarily fact-intensive" and that "it will usually be appropriate for a jury to determine whether probable cause existed"); *Hoffmeyer v. Porter*, 758 F.3d 1065, 1068 (8th Cir. 2014) (explaining that the "existence of probable cause is a question for the jury in § 1983 actions if genuine issues of material fact exist"); *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 8–9 (1st Cir. 2004) (explaining that "it is pointless to submit a probable cause question to the

jury at all unless the facts are disputed" (alterations omitted) (quoting *Bolton v. Taylor*, 367 F.3d 5, 8 n.2 (1st Cir. 2004))); *Choi v. Gaston*, 220 F.3d 1010, 1012 (9th Cir. 2000) (explaining that "whether the officers had . . . probable cause to arrest" in that case amounted to "a jury question").

This confusion is not unfounded. The probable-cause question is a mixed question of fact and law that "deal[s] with the factual and practical considerations on which reasonable people act," and that question "looks a lot like negligence, a classic jury question." Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101, 109 (2005). And in negligence cases, "when all th[e] legal rules have been exhausted and have yielded no answer, we call what remains to be decided a question of fact—which means . . . that it is meant for the jury rather than the judge[.]" Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1181 (1989). Like the negligence question, it would make sense for a jury in a civil case rather than a court to decide whether an officer had probable cause.[4] *Id.* ("Why should the question whether a person exercised reasonable care be a question [of] fact, but the question whether a search or seizure was reasonable be a question of law?"); *see also* William J. Stuntz, *The Substantive Origins of Criminal Procedure*, 105 Yale L.J. 393, 410 (1995).

But unlike the negligence question, the probable-cause question is a "constitutional term[] that define[s] the scope of a suspect's Fourth Amendment rights." Warner, *supra*, at 143–44. "[I]f juries decided probable cause and reasonable suspicion, then the extent of one's constitutional rights could vary according to the whims of any given group of twelve citizens." *Id.* at 144; *see also* Scalia, *supra*, at 1181–82 ("I imagine that [the questions'] relative importance to our liberties has much to do with" the reason we treat certain reasonableness questions as questions of fact and others as questions of law).

---

[4]We note that in the context of civil malicious prosecution actions, where a lack of probable cause is typically an element of the plaintiff's cause of action, the substantial majority of jurisdictions hold that the ultimate probable cause question is for the court. *See* Comment Note, *Probable cause or want thereof, in malicious prosecution action, as question of law for court or of fact for jury*, 87 A.L.R.2d 183, § 2 (1963). That source notes, however, that this is "undoubtedly anomalous in that it substitutes the judgment of the court for that of the jury as to the reasonableness of the defendant's conduct in the light of the admitted or established facts and beliefs[.]" *Id.*

On the other hand, the founders believed that juries safeguard our constitutional rights. *See* Federalist No. 83 (Alexander Hamilton) (describing the agreement between "[t]he friends and adversaries of the plan of the convention . . . in the value they set upon the trial by jury" as either "a valuable safeguard to liberty" or "as the very palladium of free government" despite expressing personal doubt on "the inseparable connection between the existence of liberty, and the trial by jury in civil cases"); *Letters from the Federal Farmer* (IV), *reprinted in* 2 The Complete Anti-Federalist 249–50 (Herbert J. Storing ed. 1981) (discussing the "essential" part juries play "in every free country" and describing jurors as "centinels and guardians"); *Essays of An Old Whig* (VIII), *reprinted in* 3 The Complete Anti-Federalist 49 (Herbert J. Storing ed. 1981); Charles W. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn. L. Rev. 639, 671–72 (1973) (describing the Anti-Federalists as "libertarians who avowed that important areas of protection for litigants in general, and for debtors in particular, would be placed in grave danger unless it were required that juries sit in civil cases").[5] And although we most often associate the jury's function as a safeguard against executive and legislative overreach with Article III and the Sixth Amendment's guarantee of a jury trial in criminal cases, the Seventh Amendment's guarantee of a jury trial in civil cases equally serves that function. *See* Akhil Reed Amar, *The Bill of Rights* 70–71 (1998) (explaining that, when invoked, the Seventh Amendment provides "jury oversight and jury-awarded punitive damages [that] would powerfully deter government officials" from engaging in "unreasonable conduct"); Wolfram, *supra*, at 706–08 (explaining that the Seventh Amendment protects against Congress's powers "to conjoin a tax measure with a provision setting aside trial by jury in tax cases" and "provide[s] the common citizen with a sympathetic forum in suits against [] government" action, like an "outrageous search by a constable").

Here we find *Ornelas v. United States* instructive in clarifying the confusion in our current law. The Supreme Court in *Ornelas* "granted certiorari to resolve . . . the applicable

---

[5]Although the Anti-Federalists obviously did not prevail on the ultimate question of whether the Constitution should be adopted, they did prevail on the question of whether there ought to be a Bill of Rights. *E.g.*, Wolfram, *supra*, at 672–73 (explaining that "the antifederalists were the generative force behind the seventh amendment"). So we look to their work for evidence on the original meaning of the Bill of Rights. *E.g.*, *Morgan v. Fairfield County*, 903 F.3d 553, 569 (6th Cir. 2018) (Thapar, J., concurring in part and dissenting in part). And it's in the Bill of Rights that we find the Fourth Amendment's guarantee against unreasonable searches and seizures and the Seventh Amendment's right to a jury in civil cases.

standard of appellate review" of probable-cause findings. 517 U.S. 690, 695 (1996). It explained that the probable-cause question involves two "principal components[.]" *Id.* at 696. "The first part of the analysis involves only a determination of historical facts[.]" *Id.* (describing this inquiry as "the events which occurred leading up to the" officer's action). But the second occurs after "[t]he historical facts are admitted or established[.]" *Id.* (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)). After that, "the issue is whether the facts satisfy the relevant statutory or constitutional standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Id.* at 696–97 (alterations omitted) (quoting *Swint*, 456 U.S. at 289 n.19). And appellate courts review "the[] ultimate determinations of . . . probable cause" (or "the *legal* rules for probable cause") de novo and without deference. *Id.* at 697 (emphasis added) (explaining that "[i]ndependent review is [] necessary if appellate courts are to maintain control of, and to clarify, the *legal* principles" of probable cause (emphasis added)); *see* Warner, *supra*, at 130 (describing evaluative determinations, as seen in the *Ornelas* Court's decision, as "a policy choice concerning the judicial actor better positioned to decide a particular issue"). Thus, we conclude that the ultimate question of probable cause (*separate* from the determination of historical facts) in a civil case when the historical facts are undisputed is a question of law for the court and not a jury.[6]

---

[6]We acknowledge that questions remain over whether that should be the case. *See* Scalia, *supra*, at 1180–86. "In the criminal context, the government may not prevail if the citizen can win over a jury under the Sixth Amendment." Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 817 (1994) (labeling this as a "regime of *jury* reasonableness" or one where the government must convince the jury of the reasonableness of a search and seizure); *see also United States v. Dukes*, 779 F. App'x 332, 334 (6th Cir. 2019). And the "basic principle" that "the government should generally not prevail – at least on the issue of reasonableness – if the citizen can persuade a jury of her peers" should not only govern the Sixth Amendment, but it should also "inform the Seventh" in the civil context. Amar, *Fourth Amendment First Principles*, *supra*, at 818. "'Reasonableness' is [after all] largely a matter of common sense, and *the jury* represents the common sense of common people." *Id.* (emphasis added). In fact, "[t]here is considerable evidence verifying the reasonableness role of the civil jury in search and seizure cases throughout the nineteenth century." *Id.* at 818 n.228.

Indeed, one remedy for an illegal search in common law England was a civil trespass suit against the offending authorities. *See* Amar, *The Bill of Rights*, *supra* at 69 (explaining that this remedy at the founding reflected the common law system). And one defense to such a suit was valid warrant authorizing the suit. Two of the most famous English common law cases on searches and seizures (with which the Founders would have been familiar), involved juries making reasonableness decisions regarding certain types of warrants in civil trespass actions. *See Money v. Leach*, (1765) 97 Eng. Rep. 1075 (K.B.) ("What is a probable cause of suspicion, and what is a reasonable time of detainer, are matters of fact to be determined *by a jury*." (emphasis added)); *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489 (K.B.); *cf. Entick v. Carrington*, (1765) 95 Eng. Rep. 807 (K.B.) (explaining that the jury declined to resolve the question but instead requested the court's advice in a special verdict). And there exists other

At summary judgment, the district court in this case determined that the historical facts were undisputed. *Supra*, at 6–7 (finding only that a reasonable jury could differ on the ultimate probable cause question). Nevertheless, the court reserved the ultimate question of probable cause for the jury. *Id.* at 5–6. But given the lack of disputed, historical facts, under *Ornelas*, the court should have resolved the probable-cause question as a matter of law.

The case, however, proceeded to trial. And, of course, as part of that trial, the parties presented the facts to the jury through witness testimony and exhibits. The jury, however, was not specifically asked to resolve any disputes of historical fact. That's not surprising here, given that there really weren't historical fact disputes for the jury to resolve—consistent with what happened at summary judgment. Again, given that posture, the trial court should have resolved the probable-cause question. Instead, the court instructed the jury on the concept of reasonableness and asked the jury to resolve that issue as part of its verdict in the case. But asking the jury to resolve any question beyond disputes regarding historical facts on the probable-cause question was inappropriate.

The jury found in favor of Defendants. But that ruling is not on appeal.[7] Gerics doesn't challenge it because he believes that the trial court shouldn't have given the case to the jury in the first place. But despite the fact that we agree with Gerics on all of that, we are still left with the question of whether we can review the trial court's denial of summary judgment consistent with *Ortiz*.

---

evidence from the founding of "[t]he Fourth-Seventh Amendment linkage" or "the central role of the jury in the Fourth Amendment[.]" Amar, *The Bill of Rights*, *supra* at 70–75 (pointing, for example, to "the obvious harmony" between the language James Madison used to describe the Seventh Amendment right to a civil jury and the language of the Fourth Amendment as well as other remarks and writings by the Anti-Federalists to support this position).

On the other hand, as we note above, *see supra* note 5, in malicious prosecution cases, courts typically view the probable cause question as a "mixed question of fact and law" with the court resolving whether the factual circumstances were sufficient to prove probable cause. *Munns v. De Nemours*, 17 F. Cas. 993, 995–96 (C.C.D Pa. 1811); *accord, e.g.*, *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878); *Henning v. Miller*, 8 P.2d 825, 828–29 (Wyo. 1932); *Thomas v. Rouse*, 4 S.C.L. 75, 76 (S.C. Const. App. 1806); *Turner v. Ambler* (1847), 116 Eng. Rep. 98 (Q.B.); *see also Johnstone v. Sutton*, (1786) 1 T.R. 510 (K.B.) (suggesting that there is some difference (though not on this question specifically) between a trespass action and an action for malicious prosecution).

[7]Though Gerics included the jury ruling in his notice of appeal and his civil appeal statement, he never takes it up in his appellate briefs. (*Compare* R. 116, Notice of Appeal *with* Appellant's Br. at 6–24 *and* Reply Br. at 1–12.)

We conclude that we cannot. Although the probable-cause question involves a legal determination, it is not the kind of pure legal question (like the interpretation of a legal document, for example) envisioned by *Ortiz* because it depends on the resolution of historical facts. In other words, a mixed question of law and fact is not the same as a pure legal question for purposes of applying *Ortiz* even if the factual record is undisputed at summary judgment.

As courts have noted in other contexts, summary judgment records are not trial records. *Ortiz*, 562 U.S. at 184 (implying as much given the fact that "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion"); *Nolfi*, 675 F.3d at 544–45 (differentiating between summary judgment records, which rely on "evidence presented prior to trial," and trial records, which rely on "evidence received at trial" as opposed to any record existing at the time of a prior summary judgment motion). For example, courts have said that, in the same case, denial of summary judgment (*e.g.*, a signal that a jury should resolve the case) does not preclude a directed verdict (*e.g.*, a resolution by the court and not a jury). *See, e.g.*, *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 549–50 (6th Cir. 2015) (leaving open the possibility that the party could have successfully moved for relief under Federal Rule of Civil Procedure 50 despite the district court's decision denying his summary judgment motion); *Gross v. S. Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971). To be sure, our case does not present this scenario but, suffice it to say, courts recognize that trial records and summary judgment records are not the same. To us, this strongly suggests that we should not extend *Ortiz*'s exception (allowing review of pure legal questions) to mixed questions that depend on the determinations of historical facts—even if those facts appear undisputed at summary judgment. So we "lack appellate jurisdiction over this portion of [Gerics's] appeal."**[8]** *Hill*, 799 F.3d at 550.

---

**[8]**Even if we had jurisdiction, Hall undoubtedly had probable cause to arrest Gerics that morning for stalking in violation of Michigan Compiled Laws § 750.441h(2)(a).

Michigan law criminalizes stalking as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." Mich. Comp. Laws § 750.441h(1)(d). That statute, in turn, defines harassment as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." Mich. Comp. Laws § 750.441h(1)(c). Monahan's allegations supported finding probable

As for Gerics's unlawful-seizure argument, he does not argue that Hall lacked probable cause—independent of the probable cause needed for the arrest—for the unlawful seizure claim. Instead, Gerics's unlawful seizure argument on appeal rests entirely on whether Hall had probable cause to arrest Gerics that morning. (*See* Appellant's Br. at 24.) So, we lack jurisdiction to review that claim as well.

**III.**

Based on the above reasons, we **DISMISS** the appeal for lack of jurisdiction.

---

cause. That Gerics's conduct that morning fulfilled Monahan's predictions on Gerics's behavior corroborated the truth of Monahan's allegations. *See Illinois v. Gates*, 462 U.S. 213, 246 (1983) (explaining that "corroboration of . . . [a tipster's] predictions" of a suspect's future legal conduct supports the truth of the allegations). Gerics's behavior that morning—immediately accusing Monahan and using expletives to address him—also tended to support the probable cause underlying Hall's arrest. And despite Gerics's argument to the contrary, (*see* Appellant's Br. at 21–22.), "protected speech" may serve as "a 'wholly legitimate consideration' for officers when deciding whether to make an arrest." *Neives v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)); *id.* at 1727–28 ("agree[ing] with the district court" that the officer had probable cause to make the warrantless arrest given the officer knew the suspect "had been drinking" and "observed [the suspect] speaking in a loud voice and standing close to" another officer).

We do recognize the tension between two lines of cases from this court—one that broadly states that "[a] mere allegation of criminal behavior, while possibly justifying a brief investigatory detention, is insufficient by itself to establish probable cause that a crime had been committed" and another that also broadly states that "eyewitness identification will constitute sufficient probable cause" because eyewitness observations are "based on first-hand observation . . . [and] are 'generally entitled to a presumption of reliability and veracity.'" *Wesley v. Campbell*, 779 F.3d 421, 429–30 (6th Cir. 2019) (alterations omitted) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005); *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)). Probable cause in this case results not just from Monahan's "reasonably trustworthy" eyewitness allegations but also the corroboration of Monahan's assertions by Gerics's behavior in the presence of law enforcement. *Id.* at 429 (emphasis omitted) (quoting *Logsdon v. Hains*, 492 F.3d 334, 342 (6th Cir. 2007)).

Thus, even if we had jurisdiction to review Gerics's probable-cause argument, we would not resolve it in his favor.

————————————

**CONCURRENCE**

————————————

THAPAR, Circuit Judge, concurring. One question in this case is whether a judge or jury should decide the ultimate existence of probable cause for claims brought under 42 U.S.C. § 1983. Precedent and history seem to point toward a common answer.

Start with precedent. In *Ornelas v. United States*, 517 U.S. 690 (1996), the Supreme Court held that the ultimate determination of probable cause presents a mixed question of law and fact, which appellate courts should review de novo, *see id*. at 696, 699. It naturally follows from that holding that judges—not juries—should decide whether probable cause exists when the underlying facts are undisputed. It's true that *Ornelas* involved a suppression dispute, not a civil claim under § 1983. But nothing in that case or later Supreme Court cases supports drawing such a distinction. *See Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005); *Jones v. Clark Cnty.*, 959 F.3d 748, 776 (6th Cir. 2020) (Murphy, J., concurring in part and dissenting in part). So based just on *Ornelas*, I think a lower court—bound as we are by Supreme Court precedent— could answer the question here.

History points toward the same answer. The leading case on this question appears to be *Johnstone v. Sutton*, (1786) 99 Eng. Rep. 1225 (K.B.). That case began in a somewhat dramatic fashion: with a naval battle off the coast of West Africa in the early 1780s. A mishap during the battle resulted in years of litigation that became "a cause célèbre in naval and political circles." JP van Niekerk, *Of Naval Courts Martial and Prize Claims: Some Legal Consequences of Commodore Johnstone's Secret Mission to the Cape of Good Hope and the "Battle" of Saldanha Bay, 1781 (Part 1)*, 21 Fundamina 392, 433 (2015). But eventually, the case reached the Exchequer Chamber, which issued a straightforward decision. Relevant here, the court explained that probable cause "is a mixed proposition of law and fact" and that, when the underlying facts are undisputed, probable cause presents a "question of law" for courts to decide. *Johnstone*, 99 Eng. Rep. at 1244–45. And based on the factual record before it, the court held that the defendant had probable cause and thus that the plaintiff could not prevail on his

malicious-prosecution claim. *See id*. at 99 Eng. Rep. at 1244–45; Niekerk, *supra*, at 440–41. The clear takeaway from *Johnstone* is that judges—not juries—decide whether there's probable cause under a given set of facts.

Nor were matters different across the Atlantic. Many early American cases announced the same rule. Justice Story put it well:

> What constitutes probable cause for seizure is, when the facts are given, a mere question of law, on which the court ought to instruct the jury. It is not a mere question of fact, of which the jury are the sole judges; and, therefore, the court are bound to direct the jury, whether upon the facts, there be probable cause or not.

*U.S. v. Gay*, 25 F. Cas. 1270, 1270 (C.C.D. Mass. 1815). Other cases to a similar effect are legion. *See, e.g.*, *Murray v. McLane*, 1 Del. Cas. 534, 535–36 (C.C.D. Del. 1815) (per curiam); *Munns v. De Nemours*, 17 F. Cas. 993, 995–96 (C.C.D. Pa. 1811) (Washington, J.); *Stone v. Crocker*, 24 Pick. 81, 84–85 (Mass. 1832); *Legget v. Blount*, 4 N.C. 560, 561 (1817); *Thomas v. Rouse*, 4 S.C.L. 75, 75 (S.C. Const. App. 1806). And many of these cases relied specifically on *Johnstone* for this rule. *See, e.g.*, *McCormick v. Sisson*, 7 Cow. 715, 717 (N.Y. Sup. Ct. 1827); *Nash v. Orr*, 5 S.C.L. 94, 94 (S.C. Const. App. 1812). Thus, nearly a century after *Johnstone*, the Supreme Court could invoke that "celebrated case" as laying down the rule that judges—not juries—decide the ultimate existence of probable cause. *Stewart v. Sonneborn*, 98 U.S. 187, 194 (1878).

Perhaps the rule was so readily accepted because it simply made explicit a longer standing practice of judicial supervision at common law. *See* James Bradley Thayer, *A Preliminary Treatise on Evidence at the Common Law* 223–24, 228–30 (1898); Note, *Reasonable and Probable Cause in Malicious Prosecution: For Judge or Jury?*, 20 Colum. L. Rev. 897, 898 & n.6 (1920). And that practice in turn was grounded in sound practical concerns: namely, to prevent lawsuits from discouraging the enforcement of the law. *See* 3 William Blackstone, *Commentaries on the Law of England* *126; Thayer, *supra*, at 230. But whatever the reason, it appears that "few, if any, rules of the common law rest upon a greater unanimity or strength of authority." *Burton v. St. Paul, M. & M. R. Co.*, 22 N.W. 300, 301 (Minn. 1885).

It's true that at least one early case might have suggested a different rule—albeit without any explanation or context. *See Money v. Leach*, (1765) 96 Eng. Rep. 320, 323 (K.B.) ("What is a probable cause of suspicion, and what is a reasonable time of detainer, are matters of fact to be determined by a jury."). But the same judge who wrote that opinion, Lord Mansfield, later made clear that probable cause is a question for judges when the facts are undisputed. *See Johnstone*, 99 Eng. Rep. at 1244–45. And later cases both in England and America treated this latter view as the well-established rule. *See, e.g.*, *Panton v. Williams*, (1841) 114 Eng. Rep. 66, 75–76 (Q.B.); *Stewart*, 98 U.S. at 194.

Given all this—and without any direct evidence to the contrary—I'm satisfied that *Ornelas* not only binds us as a legal matter but also rightly resolved this question as a historical matter. Since our court adopts the correct position today, I join the majority opinion.