NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0028n.06

No. 25-1386

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 14, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| LACINO HAMILTON, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| JAMES FLEMING, et al., | ) | OPINION |
| | ) | |
| Defendants-Appellants. | ) | |

Before: BOGGS, BUSH, and READLER, Circuit Judges.

**JOHN K. BUSH, Circuit Judge.** Lacino Hamilton served twenty-six years in prison for the murder of his foster mother, Willa Bias. After that long period of incarceration, the Wayne County Prosecutor's Conviction Integrity Unit determined that Hamilton was unfairly convicted, and his conviction was vacated. That conviction rested on the testimony of Oliver Cowan, a frequent detainee in the holding area on the ninth floor of the Detroit Police Department (DPD) headquarters. This ninth floor carried a special significance at the DPD because it was where Hamilton alleges that James Fleming, a former DPD detective, and William Rice, a DPD Homicide Section supervisor, participated in a scheme whereby they would give special treatment to prisoners in exchange for falsified testimony. At the summary-judgment stage, the district court denied qualified immunity to Fleming and Rice for their alleged misconduct leading up to Hamilton's conviction. We find no reversible error and **AFFIRM**.

**I.**

We recount the facts underlying this appeal in the light most favorable to Hamilton, the nonmovant. *See Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

In early 1994, the DPD began running an operation out of the ninth-floor prisoner lock-up at the DPD headquarters. The homicide officers would place special jailhouse informants in cells with other suspects with the expectation that the informants could overhear confessions and then testify to them in court. In exchange, the informants received special treatment, including favorable plea deals, trips to fast-food restaurants, television, alcohol, marijuana, and conjugal visits in fifth-floor interrogation rooms. Not only did the officers on the ninth floor encourage informants to listen for real confessions, but they also encouraged informants to offer false testimony implicating suspects in lock-up. One of the informants regularly used by the DPD was a man named Oliver Cowan.[1] Cowan's testimony as a jailhouse informant had led to the incarceration of at least six homicide suspects before Hamilton ever entered the picture. The only problem: Cowan was an unreliable informant.

Throughout DPD's ninth-floor scheme, Rice was a lieutenant in the Homicide Division, and was "thoroughly knowledgeable with every homicide investigation that was opened or ongoing." R. 50-29, Rice Affidavit, PageID 3676. Rice knew of the scheme and was integral to procuring favors and reduced sentences for the informants based on the help they gave to DPD. On one occasion, Rice even went over the head of the prosecutor's office to advocate directly to the judge for a reduced sentence because of an informant's help in twenty homicide cases.

---

[1] Cowan's name is spelled in several ways throughout the record, but Cowan seems to be the most common, so that is the spelling we adopt.

Fleming, on the other hand, had only joined the homicide unit that year, becoming a part of the squad in early 1994. These were the relevant actors on the DPD side.

Now we come to Hamilton. In the summer of 1994, Willa Bias was murdered. The DPD's investigation quickly turned to Hamilton, Ms. Bias's foster son, whom she had raised since he was four years old. The DPD arrested Hamilton a little over a week after the murder. He was held initially in the ninth-floor lock-up, where Cowan had been living for at least six or seven months.

On the same day as Hamilton's arrest, Cowan awaited sentencing on his own criminal charges. Cowan's sentencing took place not in open court but in the jury room "away from the prying eyes of the public." R. 50-20, Cowan Sentencing Tr., PageID 3146. Cowan was set to receive a five-to-fifteen-year sentence. But based on a DPD officer's testimony, the court sentenced Cowan to "one year probation, [and] one year [in the] William Dickerson facility," and "expected continuing cooperation with homicide on the cases referred to." *Id.* at 3151. The DPD officer at the hearing testified that he anticipated no problem with Cowan's continued cooperation. Still, the judge reminded Cowan that the failure to cooperate "would be a violation of probation and [Cowan] could receive up to fifteen years." *Id.* After sentencing, Cowan was to be taken to the William Dickerson facility, a county jail. But that's not where he went. He instead found himself right back on the ninth floor—just in time for Hamilton's arrival.

When Hamilton arrived, he was taken straight to the ninth-floor lock-up. He was placed in a cell by himself and never interacted with Cowan. The next morning, Fleming signed Hamilton out of the ninth floor and took him to an interrogation room on the fifth floor. Rice joined Fleming there shortly after, but neither of the officers talked to Hamilton. Instead, Fleming handcuffed Hamilton to the table, and the two officers left the room. Hamilton remained there for the next five hours.

While Hamilton waited in the interrogation room, Fleming returned to the ninth floor to speak to two of the DPD's informants—Cowan and Hewitt-El. Cowan was the more experienced of the two and had recruited Hewitt-El into working with the DPD so that Hewitt-El could also enjoy the perks offered to informants. Fleming began the conversation by asking Hewitt-El "if he was ready to earn his keep." R. 50-17, Hewitt-El Dep. Tr., PageID 3069. He then asked both informants which of them wanted the Hamilton case. Cowan volunteered. Fleming then handed Cowan two copies of a pre-written statement: one to sign and one to memorize for the preliminary examination. Hewitt-El told Cowan to leave Hamilton alone—Hewitt-El felt bad for Hamilton because Hamilton was only a teenager. Cowan responded that this was the only way to get his deal.

The pre-written statement claimed that Hamilton confessed a murder to Cowan, with some specific details included, such as where the murder took place, what time Hamilton supposedly arrived and left, and where he left the body of his victim. The statement said that seven to ten days prior, Hamilton had arrived at Willa Bias's house at about 2:00 p.m. with the intent to kill his foster brother. But the brother did not show. Instead, Ms. Bias was there. The statement continued that after Hamilton argued with Ms. Bias, he "smoked" her, stole some of her money and other valuables, and then left her body in the kitchen. R. 50-42, Cowan Statement, PageID 3846. Hamilton then allegedly waited four to five more hours in the house hoping to kill his brother. Again, his brother did not show, so, according to the statement, Hamilton left between 6 p.m. and 7 p.m.

After Cowan signed Fleming's statement, the statement worked its way to Rice. Rice used the statement as part of his basis for signing a warrant request, seeking charges against Hamilton. But the warrant request contained two false assertions. *First*, the form stated that Officer Milton

Kennedy was the officer in charge of the Hamilton case. He was not. Officer Kennedy did not know why his name appeared on the form and believed that someone else added his name to it. *Second*, a detail was added to Cowan's statement. The warrant request stated that Hamilton wanted to kill his foster brother to recover drug money. But Cowan's statement never referenced drug money. Based on this warrant request, the Wayne County Prosecutor's Office charged Hamilton with first-degree murder and possession of a firearm in the commission of a felony.

Hamilton's case quickly moved to a preliminary hearing to determine whether the state had probable cause for the prosecution. At the hearing, the prosecution relied on a single witness to connect Hamilton to the murder of Ms. Bias—Oliver Cowan. The judge at the preliminary hearing found probable cause to bind Hamilton over for trial based wholly on the word of Cowan.

Cowan died before Hamilton's trial, so the prosecution read Cowan's preliminary exam testimony into the trial record instead. On this evidence, Hamilton was convicted of second-degree murder and use of a firearm during the commission of a felony. He was sentenced to fifty to eighty years in prison.

After serving twenty-six years of his sentence, the Conviction Integrity Unit of the Wayne County Prosecutor's office recommended Hamilton's release. It stated that the jury "did not hear of the true nature of [Cowan]'s relationship with DPD and the inducements he received to testify or the concerns that had arisen over testimony of jailhouse informants." R. 50-7, Conviction Integrity Unit Memo, PageID 2586. The Wayne County Circuit Court then vacated Hamilton's convictions and sentences, and Hamilton went free.

Hamilton sued Fleming, Rice, and Ruth Carter, the prosecuting attorney from his criminal trial. The district court granted summary judgment to Carter based on absolute prosecutorial

immunity but denied qualified immunity to both Fleming and Rice on all counts. Fleming and Rice now bring this interlocutory appeal.

**II.**

We review de novo a district court's denial of summary judgment based on qualified immunity. *Clark v. Abdallah*, 131 F.4th 432, 444 (6th Cir. 2025). "A public official is entitled to qualified immunity at summary judgment when, viewing the facts in the light most favorable to the plaintiff, the challenged conduct did not violate clearly established constitutional rights of which a reasonable person would have known." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (cleaned up).

**III.**

Fleming and Rice first argue that Hamilton's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). They suggest that we have pendent appellate jurisdiction over the *Heck* claim based on *Lucier v. City of Ecorse*, 601 F. App'x 372, 376 (6th Cir. 2015). But this case was expressly overruled by *Chaney-Snell v. Young*, 98 F.4th 699, 709 (6th Cir. 2024). *Chaney-Snell* stated that we "lack pendent appellate jurisdiction over *Heck* claims in qualified-immunity appeals." *Id.* Defendants' argument on this point fails because we lack jurisdiction to consider it.

As an alternative theory, Defendants argue that Hamilton's vacated state-court conviction collaterally estops him from disputing the underlying facts of his claims. This argument fares no better. The conviction was vacated, which includes vacatur of all interlocutory rulings. *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019). "And vacated rulings have no preclusive effect under Michigan law." *Id.*

**IV.**

Fleming and Rice next assert that they were entitled to qualified immunity for each of Hamilton's claims. To grant qualified immunity, we undertake a two-pronged inquiry looking at (1) "whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right," and (2) "whether the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam) (cleaned up). To determine whether a right is clearly established, we look at whether "its contours [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). We take each claim in turn.

**A.**

Hamilton had a right under *Brady v. Maryland* to receive all material exculpatory information. 373 U.S. 83, 87 (1963). The question on appeal is whether a police officer in 1994 would have had notice of his obligation to disclose exculpatory evidence. In other words, was the right clearly established?

Our circuit precedent resolves the clearly established issue in Hamilton's favor.[2] A police officer's "Fourteenth Amendment obligation to disclose exculpatory evidence" has been clearly established since at least 1975. *Jackson v. City of Cleveland*, 925 F.3d 793, 824 (6th Cir. 2019).

---

[2] Hamilton's claim that Defendants failed to preserve the clearly established question is in tension with our precedents. *See Mills v. Cvitkovich*, No. 25-3054, 2025 WL 3043564, at *3 (6th Cir. Oct. 31, 2025). But we need not go too far down this trail because the law was clearly established in any event.

"It was also clearly established that impeachment evidence, such as the fact that a witness was coerced into making a fabricated statement, qualifies as exculpatory." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 153–55 (1972)). The right was clearly established in 1994 such that "any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Moldowan v. City of Warren*, 578 F.3d 351, 382 (6th Cir. 2009).

Defendants also contest the merits of Hamilton's *Brady* claim. In addition to showing that Defendants suppressed exculpatory evidence, Hamilton must prove that "prejudice . . . ensued" from that suppression. *Clark*, 131 F.4th at 455. Defendants here dispute the prejudice element on the ground that the *Brady* evidence was cumulative. True, Hamilton was already aware that Cowan received perks in exchange for testimony. And Defendants are correct that undisclosed cumulative evidence does not amount to a *Brady* violation. *See United States v. Warshak*, 631 F.3d 266, 300–01 (6th Cir. 2010). But this does not mean that state actors can avoid *Brady* obligations by turning over only some of the evidence "on the assumption that defense counsel will find the cookie from a trail of crumbs." *Clark*, 131 F.4th at 455 (6th Cir. 2025) (quoting *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2015)). Hamilton suspected only that Cowan was a snitch, and his trial counsel merely insinuated that Cowan received inducements in exchange for his testimony. We agree with the district court that this did not relieve Defendants of their obligation to disclose that (1) Cowan was falsely testifying as part of the ninth-floor scheme, (2) Fleming and Rice knew Cowan's testimony was false and acted to induce it, or (3) the full scope of Cowan's deal with the state. Hamilton's knowledge that Cowan had some sort of deal does not have nearly the same effect as receiving evidence that police officers induced false testimony from Cowan.

Defendants relatedly contend that Hamilton was not prejudiced because the other evidence presented at trial sufficed to convict Hamilton even had the *Brady* evidence been disclosed. But as the district court correctly observed, the prosecution made Cowan's testimony the center of its case, and, taking the facts in a light most favorable to Hamilton, a reasonable jury could conclude that the revelation that Defendants had procured false testimony from Cowan would have a reasonable probability of affecting the outcome at trial. *See Clark*, 131 F.4th at 456 ("[A] defendant undoubtedly suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness." (quotations omitted)).

We affirm the district court on Hamilton's *Brady* claim.

**B.**

Defendants next claim qualified immunity on Hamilton's fabrication-of-evidence claim. To prove this cause of action, Hamilton needs to show that Defendants "knowingly fabricated evidence against [him], and that there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (cleaned up). Defendants challenge the first part of this test. They make a single argument on appeal—that Hamilton lacks sufficient evidence to show that Defendants knew that Cowan had been given specific inducements to testify against Hamilton.[3] While we do not have jurisdiction to review the fact-based portions of sufficiency-of-the-evidence challenges, *see Johnson v. Jones*, 515 U.S. 304, 313 (1995), we do have the power to "consider[] the sufficiency of the plaintiff's proffered [*sic*] evidence, drawing all reasonable inferences in the plaintiff's favor, and making the legal

---

[3] Defendants failed to make this argument before the district court. R. 44, MSJ, PageID 1376–77. This would ordinarily result in a forfeiture of the argument on appeal, but Hamilton failed to point out this forfeiture. So any forfeiture argument has itself been forfeited. *See United States v. Shultz*, 733 F.3d 616, 619 (6th Cir. 2013). We will address the argument on its merits.

determination of whether the defendant violated a clearly established right based on those now (at least for purposes of this appeal) undisputed record facts," *Johnson v. Russell*, 155 F.4th 759, 765 (6th Cir. 2025). And that is the course we take.

This case involves multiple defendants, so we must assess qualified immunity "in the context of each individual's specific conduct." *Hopper v. Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (quoting *Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013)). Start with Fleming. Making all inferences in Hamilton's favor, the evidence supports his fabrication-of-evidence claim. Fleming took Hamilton out of the ninth-floor lockup at the DPD. Fleming then proceeded back to the ninth-floor intake area and spoke with two prisoners: Cowan and Hewitt-El. While with the prisoners, "Fleming asked Hewitt-El if he was ready to earn his keep." R. 50-17, Dep. Tr. of Hewitt-El, PageID 3069. He then turned to both prisoners and asked which of them wanted to take the Hamilton case. Cowan volunteered. Fleming handed Cowan a pre-written statement and told Cowan to memorize the statement for the preliminary examination. Cowan later told Hewitt-El that Cowan had to go through with the testimony "to get his deal." Fleming never disclosed any of this to Hamilton or Hamilton's counsel.

Fleming argues that the evidence is insufficient because the "earn his keep" statement was directed to Hewitt-El, not Cowan. Context shows why this distinction does not matter. Fleming made the statement while Hewitt-El was standing next to Cowan. Fleming then asked for a volunteer to sign a prewritten statement in the Hamilton case. Whom the first statement was directed at matters little given that Fleming immediately followed the statement by asking for a volunteer to sign a prewritten statement.

Now look at Rice. Circumstantial evidence creates a disputed fact as to the extent of Rice's involvement with the fabricated evidence in Hamilton's case. At the time, Rice was a lieutenant

in the Homicide Division, and was "thoroughly knowledgeable with every homicide investigation that was opened or ongoing." R. 50-29, Rice Affidavit, PageID 3676. Rice participated in the alleged ninth-floor snitch scheme and would sometimes talk with jailhouse informants like Hewitt-El and Cowan.

Given this factual background, we turn to Rice's direct involvement with Hamilton's case. Just before Cowan signed the statement saying he heard Hamilton confess to murder, Rice and Fleming both visited Hamilton in the fifth-floor interrogation room where Fleming had placed him. Shortly after Cowan signed the statement written by Fleming, Rice used the statement to request a warrant seeking murder charges against Hamilton. This warrant request contained irregularities. Rice approved the warrant request despite its inclusion of additional facts that were not part of Cowan's statement. Rice took no other steps to confirm the truth or falsity of Cowan's statement and never interrogated Hamilton about the statement's claims.

In sum, Rice participated in a scheme where jailhouse informants gave statements in exchange for favors. He knew that Oliver Cowan gave a statement implicating Hamilton at a time when Hamilton was being held in a fifth-floor interrogation room. He then sought criminal charges against Hamilton based on an embellished version of Cowan's statement. Rice did not take any steps to confirm the truth of Cowan's statement despite the known risk of its falsity. A jury could conclude from this information that Rice knew that the statement given by Cowan was fabricated.

This case resembles *Jackson*, 925 F.3d at 816. There, we held that a jury could conclude that Officer Stoiker was part of the fabrication of evidence because he had left the room with Officer Staimpel and then reentered with Staimpel, at which point Staimpel fabricated evidence through a signed statement. *Id.* We said that a reasonable jury could conclude from this that Stoiker played some part in the fabrication. *Id.* So too here. Rice was with Fleming just before

Fleming took Cowan's statement, though he was not in the room at the time. Rice then used the statement, with his new allegation about drug money, to have Hamilton charged with murder.

Taking the facts in the light most favorable to Hamilton, Fleming and Rice are not entitled to qualified immunity on Hamilton's fabrication-of-evidence claim.

**C.**

The district court denied summary judgment to Defendants on the malicious-prosecution claim because the issue contained "genuine questions of material fact for the jury to resolve" as to probable cause. R. 58, Op. & Order, PageID 4024. Whether a jury could find probable cause is the incorrect question at summary judgment. When the facts are disputed, we take the nonmovant's version of the facts and look at the existence of probable cause as "a question of law for the court and not a jury." *Gerics v. Trevino*, 974 F.3d 798, 805 (6th Cir. 2020). Taking this question as one of law, based on Hamilton's version of facts, probable cause did not support Hamilton's prosecution.

Although police officers do not make the decision to prosecute, they may still be liable if they supply falsehoods to a prosecutor "knowing that prosecutorial reliance is likely" and the prosecutor actually relies on those falsehoods. *Tanner v. Walters*, 98 F.4th 726, 734 (6th Cir. 2024) (quoting *Jones v. City of Elyria*, 947 F.3d 905, 918 (6th Cir. 2020)). For his malicious-prosecution claim, Hamilton must prove that "(1) [Defendants] made, influenced, or participated in the decision to prosecute [Hamilton]; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, [Hamilton] suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the [Hamilton]'s favor." *Id.* (quoting *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016)). Defendants challenge elements 1, 2, and 4, but none of their arguments persuade.

*First*, Fleming and Rice each may have influenced the prosecuting decision by fabricating the evidence relied on to secure the charges against Hamilton. This creates a fact question on the first element. *See Jackson*, 925 F.3d at 820–21 (concluding that a reasonable jury could find that an officer's misconduct "influenced the decision to bring charges" because the decision was based on a witness statement "that a jury could reasonably find to have been fabricated" by the officer); *Sykes v. Anderson*, 625 F.3d 294, 312–13 (6th Cir. 2010) (concluding that a reasonable jury could find that false testimony influenced the charging decision when it was the sole basis for the magistrate's probable cause determination).

*Second*, Defendants argue that probable cause existed for Hamilton's prosecution separate from Cowan's statement. Probable cause "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). Defendants argue that probable cause existed for the prosecution based on circumstantial evidence against Hamilton as well as a statement that Darnell Thompson, a friend of Hamilton, gave to the police saying that Hamilton confessed to the murder. This evidence is relevant to the DPD's decision to arrest Hamilton, but here we look at the probable cause supporting the decision to *prosecute*. *See Sykes*, 625 F.3d at 310–11 ("In order to distinguish appropriately this claim from one of false arrest, we must consider not only whether the Defendants had probable cause to arrest the Plaintiffs but also whether probable cause existed to initiate the criminal proceeding against the Plaintiffs."). That means we look to the evidence the prosecutor presented at the preliminary hearing. The preliminary hearing in Michigan is where the prosecutor presents evidence to the magistrate asking to have the defendant bound over for trial. *See id.* at 312. Because this is where the formal probable-cause determination takes place, we look only to the evidence presented at the preliminary hearing. This is no different from

warrants. Except in "the *very* rare case" involving an intentional omission of exculpatory evidence, *Mays v. City of Dayton*, 134 F.3d 809, 806 (6th Cir. 1998), when looking at whether probable cause supported a search warrant, we look to what evidence the officer presented in the warrant application, not to other evidence the officer could have placed in the warrant application but chose not to. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). The same is true here. If we want to know what evidence established probable cause for the prosecution, we look to the evidence the prosecutor presented at the probable-cause hearing. *See Sykes*, 625 F.3d at 310–11; *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007).

The only evidence presented at the preliminary hearing was Cowan's testimony. But "probable cause, of course, is not supported by fabricated evidence." *Clark*, 131 F.4th at 453. So if Cowan's testimony was fabricated, the prosecution was not supported by probable cause. Thus, this element also comes down to a dispute of fact as to whether Fleming and Rice fabricated Cowan's testimony.

*Third*, Defendants have forfeited any argument that a vacated conviction is not a favorable termination. Defendants dedicate all of two sentences to this argument in their opening brief. And even then, the sentence only points out that Hamilton's conviction was vacated; it does not make an argument either way as to whether a vacated conviction counts as a favorable termination. "[A]ddressing an issue on appeal 'requires developed argument; a party is required to do more than advert to an issue in a perfunctory manner.'" *Howard v. Collins*, 2025 WL 429916, at *8 (6th Cir. Feb. 7, 2025) (quoting *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 611 (6th Cir. 2016)).

**D.**

Finally, Fleming and Rice argue that they are entitled to qualified immunity on Hamilton's civil-conspiracy claim. Defendants' only argument on this point is that Hamilton lacks sufficient facts to show a conspiracy to violate Hamilton's rights. We disagree. A jury could reasonably conclude that (1) Fleming and Rice engaged in a concerted plan to give favors to individuals on the ninth floor in exchange for false statements, (2) they planned to use those false statements to deny criminal defendants their rights, and (3) they took steps in furtherance of this plan. Hamilton has presented sufficient evidence that he was a victim of this plan and Defendants deprived him of his constitutional rights.

For each of Hamilton's claims, Defendants were properly denied qualified immunity.

**V.**

For the reasons outlined above, we **AFFIRM** the decision of the district court.